STATE OF IOWA, Appellee v. C. W. COTHERN ET AL., Appellants.

Larceny: FELONIOUS TAKING. To constitute larceny there must be a wrongful taking of the property; where the possession is rightful even though with the intent of making a wrongful disposition of the property it is not larceny but embezzlement, if the disposition was criminal in character; and a conspiracy to embezzle the property will not render the taking felonious when the possession was in fact rightful.

*Appeal from Monroe District Court.*— HON. C. W. VERMILLION, Judge.

SATURDAY, APRIL 11, 1908.

THE appellants, who are C. W. Cothern and Ollie Crutcher, with Albert Evans, James Garrett, George Vandewenter, and Irvin Hicks, were jointly indicted for larceny. All the defendants — except Evans, who had not been apprehended — pleaded not guilty, and were tried together, with the result that the appealing defendants, Cothern and Crutcher were found guilty, and the other defendants were found not guilty. Judgment was entered on the verdict, and Cothern and Crutcher appeal.— *Reversed.*

*Woodson & Brown,* for appellants.

*H. W. Byers,* Attorney General, and *C. W. Lyon,* Assistant Attorney General, for the State.

BISHOP, J.— The indictment charged the defendants with the crime of larceny, in that about May 18, 1905, in the county of Monroe, said defendants " aided, abetted and

confederated," did steal of the property of Local Union
No. 1799, United Mine Workers of America, located in said
county, money of the amount and value of $769.40, etc.   At
the close of the evidence in chief for the State, the defend-
ants joined in a motion for a directed verdict on various
grounds; one being that the evidence failed to show that
the crime charged had been committed.   The motion was
overruled, and the ruling is assigned as error.   In substance
the evidence is as follows:   The defendants, including
Evans, resided in the mining town of Buxton, and were
coal miners.   All belonged to the Local Miners' Union,
which was a branch of the organization known as the United
Mine Workers of America, and for a short time Evans had
been the recording secretary of such local union.   It ap-
pears that at stated times the local union paid dues to the
district and national organizations of the union, and it was
the duty of the local recording secretary to attend to the .
transmission of such dues.   The funds of the local union
were derived from payment of dues by each individual
member, and such funds were kept on deposit in a local
bank subject to be drawn on orders signed by the president
and financial secretary.   In May, 1905, two orders on the
bank — one for $464.15 and the other for $305.25 — were
issued and placed in the hands of Evans to enable him to
make remittances to the district and national unions.   Each
order was a simple direction to pay to Evans without qual-
ification or explanation.   Evans presented the orders dur-
ing banking hours, received the sum of money called for
thereby, payment being made principally in $20 gold pieces,
and this money he carried away in his pockets.   Nothing
was done by him in the way of forwarding the money, and
he was known to have it on his person up to a late hour in
the evening.   About midnight he appeared on a residence
street of the town, and, when near a church, he made an
outcry.   Cothern, who lived close by, at once ran out, and
went to his side, whereupon a revolver shot was fired.   The

two men then ran down the street a short distance to a rail-way embankment, where other shots were fired. On coming back, Evans told persons who had been attracted to the scene that he had been held up by two men whom he did not know and robbed of the money belonging to the union. One Perdue, on being called to the stand, testified that shortly before the election of Evans as secretary of the union he, the witness, was present at a conversation shared in by all the defendants, in which it was talked that, if Evans was elected secretary, he could get some money for them, and he says that on the day before the alleged hold-up of Evans he heard a further conversation between Evans, Cothern and Crutcher, in which a plan was formed whereby Evans was to be met by the others on a residence street near a church, and the money taken away from him; that about midnight he went down towards the church in company with one Francis, and saw Evans, Cothern, and another man whom he could not positively identify in the street. Evans dropped something that sounded like money, which Cothern picked up, and then fired two shots with his revolver. Francis testified that he was with Perdue near the church at the time of the supposed hold-up, and his testimony as to what took place was in substantial accord with the story as told by Perdue.

We think the facts do not make out a case of larceny. To constitute larceny there must be a trespass in the taking. This is fundamental in the law on the subject. True, it is not necessary that the taking be by force or stealth. If possession is obtained by fraud with intent to convert the property to the use of the taker, and it is so converted, larceny may be charged. But here the taking was in all respects rightful. It was rightful, even though the taker intended to make a wrongful disposition of the money once it was in his possession. The wrongful disposition, if criminal in character, would be embezzlement. At least it could not be larceny because one cannot steal from himself. There

is no principle on which it can be said that the conspiracy, conceding such to have been established, made the taking wrongful. Moreover, the conspiracy had to do not with the taking, but with the disposition, of the money, and, if anything, it was a conspiracy to embezzle rather than to commit a larceny. And this would be true, even though the conspiracy had its beginning before the election of Evans, and had that event in contemplation as one of the steps toward the ultimate wrongful act. The election of Evans must be regarded as rightful whatever the secret purpose he had in view in aspiring to the office, and, as we have said, the money came into his possession in the course of legal right.

It follows that the ruling on the motion was error. In view of the conclusion thus reached, we need not consider other errors assigned and argued.

The judgment is reversed, and the cause is remanded, with instructions to enter discharge of the defendants.—*Reversed.*